AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT

### for the
### Western District of Washington

In the Matter of the Search of

*(Briefly describe the property to be searched
or identify the person by name and address)*

Information associated with Facebook Account with user
number 100005498676248, and name "tavo.vega.3950"
and "Tavo Vega," as described in Attachments A and B

)
)
)
)
)
)

Case No.   MJ18-5016

**FILED LODGED**
**RECEIVED**
JAN 26 2018
CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA
BY                                  DEPUTY

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A

located in the _____ Northern _____ District of _____ California _____, there is now concealed *(identify the person or describe the property to be seized)*:
See Attachment B

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 USC 841 and 846 | Distribution of controlled substances and conspiracy to do the same |

The application is based on these facts:

☑ Continued on the attached sheet.

☑ Delayed notice of __90__ days (give exact ending date if more than 30 days: __04/26/2018__ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

Jonathan L. Pearson, DEA Task Force Officer
*Printed name and title*

Sworn to before me and signed in my presence.

Date: __1/26/18__

City and state:  Tacoma, WA

*Judge's signature*

J. Richard Creatura, United States Magistrate Judge
*Printed name and title*

# AFFIDAVIT OF TFO JONATHAN PEARSON

STATE OF WASHINGTON           )
                              )   ss
COUNTY OF PIERCE              )

I, Jonathan L. Pearson, Task Force Officer, Drug Enforcement Administration (DEA), United States Department of Justice, being first duly sworn on oath, depose and state:

## I.   AGENT BACKGROUND AND QUALIFICATIONS

1.      I am a duly commissioned Police Detective for the Auburn Police Department and a Task Force Officer (TFO) with the Drug Enforcement Administration (DEA). Accordingly, I am an investigative or law enforcement officer within the meaning of Section 2510(7) of Title 18, United States Code, and am empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code. I have been employed by the Auburn Police Department since November 2010, most recently in the Narcotics Unit. From 2006 to 2010, I was a sworn officer in the Kent Police Department. My formal training includes a Bachelor's Degree in Law and Justice from Central Washington University, where my coursework included classes in Criminal Procedure and Criminal Law. Upon joining the Kent Police Department, I completed 720 hours of training at the Basic Law Enforcement Academy, where I was trained in the areas of Criminal Investigations, Narcotics Investigation, Interview Skills, Criminal Law, Criminal Procedures, Court Orders, and Search Warrants. I have also completed the 80-hour Seattle Police Undercover Operations/Investigations School.

2.      As a police officer, I have investigated numerous felony and misdemeanor drug violations. Further, I have policed areas with high drug usage and associated crimes. I have planned, participated in, and supervised the execution of more than 100 search warrants authorizing the search of locations associated with narcotic traffickers and their co-conspirators, such as residences, businesses, storage facilities, outbuildings,

AFFIDAVIT OF JONATHAN L. PEARSON - 1

1  safety deposit boxes, and vehicles.  I have testified in grand jury proceedings and written

2  reports in the course of investigations.  These investigations have resulted in state and

3  federal prosecutions of individuals who have possessed, imported, or distributed

4  controlled substances, including marijuana, cocaine, methamphetamine, heroin, and

5  prescription medications, as well as the seizure of those illegal drugs and the proceeds

6  from their sales.

## II.     PURPOSE OF AFFIDAVIT

8       3.      This Affidavit is submitted in support of an application for a search warrant

9  under Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A)

10 to require Facebook to disclose to the government records and other information in its

11 possession, pertaining to the subscriber or customer associated with the following

12 Facebook account (the "SUBJECT ACCOUNT"):

13          a.  Facebook user number "100005498676248" and Facebook user name

14              "tavo.vega.3950," registered under the name "Tavo Vega"

15 Based on the information provided below, I believe the current user of this Facebook

16 account is Octaviano ASTORGA-VEGA, a known drug trafficker and current fugitive in

17 case CR15-255RSL in the Western District of Washington.

18      4.      All of the requested information is stored at premises owned, maintained,

19 controlled, or operated by Facebook, a social networking company headquartered in

20 Menlo Park, California.  The information to be searched is described in the following

21 paragraphs and in Attachment B.  This is the first application for a search warrant of the

22 SUBJECT ACCOUNT in this investigation.

23      5.      Based on the information set forth below, I believe that there is probable

24 cause to believe that the SUBJECT ACCOUNT has been used, and will continue to be

25 used, to facilitate violations of the Controlled Substances Act, and that the information

26 requested pursuant to this search warrant will provide evidence of such drug trafficking

27 crimes committed by Octaviano ASTORGA-VEGA and his brothers and associates, and

28

AFFIDAVIT OF JONATHAN L. PEARSON - 2

1 will also assist in locating and apprehending Octaviano ASTORGA-VEGA, a known

2 fugitive.

### III.    FACEBOOK INFORMATION STORAGE

4        6.        I am aware from my experience and training, and consultation with other

5 investigators, of the following information about Facebook:

6        7.        Facebook owns and operates a free-access social networking website of the

7 same name, accessed at http://www.facebook.com.  Facebook allows its users to establish

8 accounts with Facebook, and users can then use their accounts to share written news,

9 photographs, videos, and other information with other Facebook users, and sometimes

10 with the general public.

11        8.        Facebook asks users to provide basic contact and personal identifying

12 information to Facebook, either during the registration process or thereafter.  This

13 information may include the user's full name, birth date, gender, contact e-mail

14 address(es), Facebook passwords, Facebook security questions and answers (for

15 password retrieval), physical address (including city, state, and zip code), telephone

16 numbers, screen names, websites, and other personal identifiers.  Facebook also assigns a

17 user identification number to each account.

18        9.        I know from speaking with other law enforcement that "cookies" are small

19 files placed by a server (such as those used by Facebook) on a device to track the user

20 and potentially verify a user's authentication status across multiple sites or

21 webpages.  This cookie could be unique to a particular account (e.g., the Facebook

22 account) or to a given device (e.g., the particular phone used to access the Facebook

23 account).  The next time a user visits a particular site or server, the server will ask for

24 certain cookies to see if the server has interacted with that user before.  Cookies can also

25 be used to determine "machine cookie overlap," or multiple accounts that have been

26 accessed by the same individual machine (e.g., two Facebook accounts that have been

27 accessed on the same phone).  The machine cookie overlap thus allows Facebook to track

28 accounts that are "linked" to each other because the same user account (username on a

AFFIDAVIT OF JONATHAN L. PEARSON - 3

1  computer) on the same device accessed multiple Facebook accounts.  This can identify

2  either multiple Facebook accounts used by the same person or used by different people

3  sharing the same user account and device.  In either case, the machine cookie overlap

4  means that the users of the linked accounts are the same person or two people in close

5  proximity to each other (by virtue of them using the same device).

6      10.    Facebook users may join one or more groups or networks to connect and

7  interact with other users who are members of the same group or network.  Facebook

8  assigns a group identification number to each group.  A Facebook user can also connect

9  directly with individual Facebook users by sending each user a "Friend Request."  If the

10  recipient of a "Friend Request" accepts the request, then the two users will become

11  "Friends" for purposes of Facebook and can exchange communications or view

12  information about each other.  Each Facebook user's account includes a list of that user's

13  "Friends" and a "News Feed," which highlights information about the user's "Friends,"

14  such as profile changes, upcoming events, and birthdays.

15      11.    Facebook users can select different levels of privacy for the

16  communications and information associated with their Facebook accounts.  By adjusting

17  these privacy settings, a Facebook user can make information available only to himself or

18  herself, to particular Facebook users, or to anyone with access to the Internet, including

19  people who are not Facebook users.  A Facebook user can also create "lists" of Facebook

20  friends to facilitate the application of these privacy settings.  Facebook accounts also

21  include other account settings that users can adjust to control, for example, the types of

22  notifications they receive from Facebook.

23      12.    Facebook users can create profiles that include photographs, lists of

24  personal interests, and other information.  Facebook users can also post "status" updates

25  about their whereabouts and actions, as well as links to videos, photographs, articles, and

26  other items available elsewhere on the Internet.  Facebook users can also post information

27  about upcoming "events," such as social occasions, by listing the event's time, location,

28  host, and guest list.  In addition, Facebook users can "check in" to particular locations or

AFFIDAVIT OF JONATHAN L. PEARSON - 4

1 │ add their geographic locations to their Facebook posts, thereby revealing their geographic

2 │ locations at particular dates and times.  A particular user's profile page also includes a

3 │ "Wall," which is a space where the user and his or her "Friends" can post messages,

4 │ attachments, and links that will typically be visible to anyone who can view the user's

5 │ profile.

6 │      13.    Facebook allows users to upload photos and videos.  It also provides users

7 │ the ability to "tag" (i.e., label) other Facebook users in a photo or video.  When a user is

8 │ tagged in a photo or video, he or she receives a notification of the tag and a link to see the

9 │ photo or video.  For Facebook's purposes, the photos and videos associated with a user's

10 │ account will include all photos and videos uploaded by that user that have not been

11 │ deleted, as well as all photos and videos uploaded by any user that have that user tagged

12 │ in them.

13 │      14.    Facebook users can exchange private messages on Facebook with other

14 │ users.  These messages, which are similar to e-mail messages, are sent to the recipient's

15 │ "Inbox" on Facebook, which also stores copies of messages sent by the recipient, as well

16 │ as other information.  Facebook users can also post comments on the Facebook profiles

17 │ of other users or on their own profiles; such comments are typically associated with a

18 │ specific posting or item on the profile.  In addition, Facebook has a Chat feature that

19 │ allows users to send and receive instant messages through Facebook.  These chat

20 │ communications are stored in the chat history for the account.  Facebook also has a Video

21 │ Calling feature, and although Facebook does not record the calls themselves, it does keep

22 │ records of the date of each call.

23 │      15.    If a Facebook user does not want to interact with another user on Facebook,

24 │ the first user can "block" the second user from seeing his or her account.

25 │      16.    Facebook has a search function that enables its users to search Facebook for

26 │ keywords, usernames, or pages, among other things.

27 │      17.    Each Facebook account has an activity log, which is a list of the user's

28 │ posts and other Facebook activities from the inception of the account to the present.  The

AFFIDAVIT OF JONATHAN L. PEARSON - 5

activity log includes stories and photos that the user has been tagged in, as well as connections made through the account, such as "liking" a Facebook page or adding someone as a friend. The activity log is visible to the user but cannot be viewed by people who visit the user's Facebook page.

18.    Facebook Notes is a blogging feature available to Facebook users, and it enables users to write and post notes or personal web logs ("blogs"), or to import their blogs from other services, such as Xanga, LiveJournal, and Blogger.

19.    In addition to the applications described above, Facebook also provides its users with access to thousands of other applications on the Facebook platform. When a Facebook user accesses or uses one of these applications, an update about that the user's access or use of that application may appear on the user's profile page.

20.    Some Facebook pages are affiliated with groups of users, rather than one individual user. Membership in the group is monitored and regulated by the administrator or head of the group, who can invite new members and reject or accept requests by users to enter. Facebook can identify all users who are currently registered to a particular group and can identify the administrator and/or creator of the group. Facebook uses the term "Group Contact Info" to describe the contact information for the group's creator and/or administrator, as well as a PDF of the current status of the group profile page.

21.    Facebook uses the term "Neoprint" to describe an expanded view of a given user profile. The "Neoprint" for a given user can include the following information from the user's profile:  profile contact information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; friend lists, including the friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings; rejected "Friend" requests; comments; gifts; pokes; tags; and information about the user's access and use of Facebook applications.

1    22.    Facebook also retains Internet Protocol ("IP") logs for a given user ID or IP
2  address.  These logs may contain information about the actions taken by the user ID or IP
3  address on Facebook, including information about the type of action, the date and time of
4  the action, and the user ID and IP address associated with the action.  For example, if a
5  user views a Facebook profile, that user's IP log would reflect the fact that the user
6  viewed the profile, and would show when and from what IP address the user did so.

7    23.    Social networking providers like Facebook typically retain additional
8  information about their users' accounts, such as information about the length of service
9  (including start date), the types of service utilized, and the means and source of any
10  payments associated with the service (including any credit card or bank account number).
11  In some cases, Facebook users may communicate directly with Facebook about issues
12  relating to their accounts, such as technical problems, billing inquiries, or complaints
13  from other users.  Social networking providers like Facebook typically retain records
14  about such communications, including records of contacts between the user and the
15  provider's support services, as well as records of any actions taken by the provider or
16  user as a result of the communications.

17    24.    Therefore, the computers of Facebook are likely to contain all the material
18  described above, including stored electronic communications and information concerning
19  subscribers and their use of Facebook, such as account access information, transaction
20  information, and other account information.  I believe such information is likely to
21  constitute evidence of the drug trafficking crimes currently under investigation and the
22  current location of Octaviano ASTORGA-VEGA, a fugitive.

### IV.    SUMMARY OF PROBABLE CAUSE

24    25.    The information set forth in this Affidavit consists of information I have
25  gathered and observed firsthand through the course of this investigation to date, as well
26  as information relayed to me by other law enforcement personnel, my review of law
27  enforcement reports, interviews of witnesses, and my review and analysis of toll records.
28  Since I am submitting this Affidavit for the limited purpose of obtaining authorization to

AFFIDAVIT OF JONATHAN L. PEARSON - 7

1  search the SUBJECT ACCOUNT as described herein, I have not included every fact

2  known to me concerning this investigation.  Instead, I have set forth only the facts that I

3  believe are essential to a fair determination of probable cause.

4  **A.      Fugitive Status of Octaviano ASTORGA-VEGA**

5          26.      In 2014, the DEA Seattle Field Division Office ("DEA Seattle") conducted

6  a federal wiretap investigation targeting drug traffickers in Western Washington.

7  Pursuant to this investigation, the DEA identified brothers Octaviano ASTORGA-VEGA

8  and Efrain ASTORGA-VEGA as methamphetamine traffickers operating in Western

9  Washington.

10         27.      At the same time, investigators with the Kent Police Department ("Kent

11  PD") were conducting an independent drug trafficking investigation.  Pursuant to their

12  investigation, in August of 2014, Kent PD investigators conducted a controlled purchase

13  of a half-pound of methamphetamine from a trafficker identified as Alfonso

14  VILLASENOR.  Following the controlled purchase, Kent PD investigators submitted the

15  packaging from the half-pound of methamphetamine to King County AFIS for fingerprint

16  examination.  AFIS identified the prints of Octaviano ASTORGA-VEGA on the

17  packaging.  Kent PD investigators subsequently learned that Octaviano ASTORGA-

18  VEGA was a suspect in the Seattle DEA wiretap investigation, and informed DEA

19  Seattle of the controlled purchase and fingerprint analysis.

20         28.      Pursuant to the DEA Seattle investigation, on July 29, 2015, a federal

21  Grand Jury in the Western District of Washington returned an indictment charging

22  Octaviano ASTORGA-VEGA and his brother, Efrain ASTORGA-VEGA, with

23  Conspiracy to Distribute a Controlled Substance, in violation of Title 18, United States

24  Code, Sections 841(a)(1), 841(b)(1)(A) and 846, under case number CR15-255RSL.

25  Arrest warrants issued for both defendants, but investigators were unable to locate them

26  and both defendants remained at large.

27         29.      Nearly 18 months later, on January 28, 2017, agents arrested Efrain

28  ASTORGA-VEGA on the outstanding warrant.  On July 5, 2017, Efrain ASTORGA-

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   VEGA entered a plea of guilty to a Possession of Methamphetamine with Intent to

2   Distribute, in violation of Title 18, United States Code, Sections 841(a)(1), 841(b)(1)(A)

3   and Title 18, United States Code, Section 2, as charged in a Superseding Information.  On

4   October 20, 2017, the Court sentenced Efrain ASTORGA-VEGA to 84 months of

5   imprisonment.

6          30.    Octaviano ASTORGA-VEGA was never arrested on the warrant and is

7   believed to have fled to Mexico.  He is currently a fugitive.

8   **B.     Current Investigation**

9          31.    In January 2017, Kent PD investigators received information from

10  Confidential Source 1 (CS1)[1] regarding Octaviano ASTORGA-VEGA and Efrain

11  ASTORGA-VEGA.  CS1 reported that s/he had talked to Octaviano ASTORGA-VEGA,

12  who stated that he was in Mexico.  CS1 also reported that Efrain ASTORGA-VEGA was

13  in Western Washington and was continuing to traffic drugs.  During the first week of

14  January 2017, Kent PD investigators utilized CS1 to conduct a controlled purchase of a

15  half-pound of methamphetamine from Efrain ASTORGA-VEGA.  Several days after the

16  controlled purchase, CS1 reported to Kent PD investigators that Efrain ASTORGA-

17  VEGA had travelled to Mexico, but told CS1 that he would still be able to arrange future

18  methamphetamine deliveries to CS1.  Efrain ASTORGA-VEGA referred CS1 to his

19  brother, Jaime ASTORGA-VEGA, whom Efrain ASTORGA-VEGA said would deliver

20  methamphetamine to CS1 when needed.  On January 19, 2017, Kent PD investigators

21

22

23

24  [1] Confidential Source 1 (CS1) first began providing information and assistance to KPD detectives in January of 2016. CS1 has a criminal history consisting of two prior arrests for Criminal Trespass, two prior arrests for Drug
25  Paraphernalia, and three criminal driving offenses. CS1 agreed to cooperate with the KPD for financial compensation. CS1 has provided valuable and reliable assistance in the investigations of drug traffickers within
26  King County and throughout Western Washington. CS1 is familiar with heroin, methamphetamine, and cocaine, and the associated methods of transportation, concealment, packaging and sale. To date, CS1 has conducted 11
27  controlled drug purchases in six separate investigations. Each controlled buy with CS1 has yielded an amount of narcotics consistent with the amount paid. CS1 has also assisted by providing intelligence related to other
28  investigations in which CS1 did not personally participate. Much of this information was unknown to law enforcement at the time CS1 provided it, but investigators later corroborated it.

AFFIDAVIT OF JONATHAN L. PEARSON - 9

1 | utilized CS1 to conduct a controlled purchase of approximately three ounces of

2 | methamphetamine from Jaime ASTORGA-VEGA in Kent, Washington.

3 |      32.     Kent PD investigators were already familiar with Jaime ASTORGA-VEGA

4 | because, in 2016, a source of information (SOI) had identified ASTORGA-VEGA as a

5 | methamphetamine trafficker operating in Kent.  This SOI stated that s/he would regularly

6 | purchase between five and ten pounds of methamphetamine at a time from Jaime

7 | ASTORGA-VEGA, who would personally deliver it to the SOI.  In December 2016,

8 | while being monitored by Kent PD investigators, the SOI called Jaime ASTORGA-

9 | VEGA and the two discussed, in English, future drug transactions and a $20,000 drug

10 | debt that the SOI owed to Jaime ASTORGA-VEGA.  However, due to the large drug

11 | debt SOI owed, investigators were not able to conduct any controlled purchases using the

12 | SOI and decided not to take enforcement action with respect to Jaime ASTORGA-VEGA

13 | at that time (in 2016).

14 |      33.     Following the Kent PD controlled purchases from Efrain ASTORGA-

15 | VEGA and Jaime ASTORGA-VEGA in January 2017, investigators with Kent PD

16 | contacted DEA Seattle and learned that Efrain ASTORGA-VEGA had been previously

17 | indicted for drug trafficking charges associated with the DEA Seattle wiretap

18 | investigation mentioned above.  Based on the January 2017 controlled purchase from

19 | Efrain ASTORGA-VEGA, Seattle DEA agents obtained a tracking warrant for Efrain

20 | ASTORGA-VEGA's cell phone.  Using GPS location data obtained pursuant to that

21 | warrant, on January 24, 2017, investigators discovered that the phone, believed to be in

22 | Efrain ASTORGA-VEGA's possession, was located near San Ysidro, California.  On

23 | January 27, 2017, investigators began to receive location coordinates for the phone

24 | showing that it was travelling northbound on Interstate 5 (I-5) toward Washington.

25 |      34.     On January 28, 2017, investigators with DEA Seattle and Kent PD

26 | conducted surveillance along I-5, north of Portland, Oregon, where they observed Efrain

27 | ASTORGA-VEGA driving a 2012 Volkswagen Passat.  Investigators coordinated with a

28 | Washington State Patrol Trooper to stop the Passat.  Efrain ASTORGA-VEGA was

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   arrested on the outstanding federal warrant, and subsequently pled guilty and was

2   sentenced to 84 months' imprisonment as described above.  During a search of the Passat,

3   investigators located and seized approximately 16 pounds of methamphetamine from

4   hidden compartments within the Passat.  CS1 was then put in contact with Jaime

5   ASTORGA-VEGA, who was handling business following Efrain ASTORGA-VEGA's

6   arrest.

7          35.    At the same time that Kent PD was investigating Efrain ASTORGA-VEGA

8   and Jaime ASTORGA-VEGA, DEA Tacoma began investigating Pablo VEGA-CRUZ

9   and Jesus VEGA-PEREZ – who were later determined to be cousins of the ASTORGA-

10  VEGA brothers – and who were also distributing methamphetamine in Western

11  Washington.  DEA Tacoma agents used Confidential Source 2 (CS2)[2] to conduct several

12  controlled purchases of methamphetamine from VEGA-CRUZ and VEGA-PEREZ.  In

13  January 2017, DEA Tacoma agents stopped a vehicle in which VEGA-CRUZ and

14  VEGA-PEREZ were returning to Western Washington from Southern California.  During

15  the stop, agents seized 14 pounds of methamphetamine and arrested VEGA-CRUZ and

16  VEGA-PEREZ.

17         36.    As the DEA Tacoma investigation continued, agents utilized CS2 to

18  conduct controlled purchases of methamphetamine from Martin VEGA-VEGA (another

19  cousin of the ASTORGA-VEGA brothers) and Jose Antelmo VEGA-PEREZ (the

20  younger brother of Jesus VEGA-PEREZ, who was arrested in the 14-pound load vehicle

21  mentioned above).  In March 2017, DEA Tacoma agents stopped a vehicle driven by

22  Martin VEGA-VEGA, who was returning to Western Washington from Southern

23  ─────────────────

24  [2] Confidential Source 2 (CS2) began providing information and assistance to the DEA in December 2012.  CS2 has
25  a criminal history consisting of prior arrests for drug related crimes; CS2 has no criminal convictions.  CS2 is
providing information and assistance to the DEA in exchange for monetary compensation.  Since December 2012,
26  CS2 has provided information on a regular basis that has been valuable in multiple drug trafficking investigations.
At the direction of DEA agents, CS2 has performed controlled drug purchases on numerous occasions and has
27  provided information regarding drug traffickers that has been proven credible and reliable.  The information
provided by CS2 during these investigations has been verified through prior and/or current investigations, as well as
28  other sources of information.  Information provided by CS2 has resulted in the seizure of multiple pounds of heroin
and methamphetamine.

1  California, and seized 25 pounds of methamphetamine.  During a search warrant served

2  at Martin VEGA-VEGA's apartment in Kent, Washington, agents seized $10,000 in cash.

3       37.     Following these three seizures, DEA Tacoma and Kent PD decided to

4  combine investigative efforts related to the DTO, the main focus of the investigation

5  being DTO leader Jaime ASTORGA-VEGA.  In March 2017, Kent PD used CS1 to call

6  and order methamphetamine from Jaime ASTORGA-VEGA, who sent an associate, Jose

7  ALVAREZ-SANCHEZ, to deliver the drugs to CS1.  In a continued effort to develop

8  evidence against Jaime ASTORGA-VEGA, agents introduced two undercover agents to

9  ALVAREZ-SANCHEZ.  Initially, a Kent PD Detective (UC1) purchased

10  methamphetamine directly from ALVAREZ-SANCHEZ on two occasions.  Through

11  surveillance conducted during these transactions, agents identified Javier GARCIA-

12  RODRIGUEZ as the person who delivered the methamphetamine to ALVAREZ-

13  SANCHEZ prior to the transactions with UC1.

14       38.     Agents then devised a plan to attempt to obtain more information regarding

15  the relationship (i.e., organizational structure) between Jaime ASTORGA-VEGA, Jose

16  ALVAREZ-SANCHEZ, and Javier GARCIA-RODRIGUEZ.  UC1 introduced a DEA

17  undercover agent (UC2) to ALVAREZ-SANCHEZ as a higher-quantity purchaser from

18  Alaska.  UC2 had several meetings with ALVAREZ-SANCHEZ to negotiate a large

19  quantity (20-pound) methamphetamine transaction.  UC2 conducted a controlled

20  purchase of two pounds of methamphetamine from ALVAREZ-SANCHEZ, during

21  which agents identified Juan RODRIGUEZ-RODRIGUEZ as the person who delivered

22  the drugs to ALVAREZ-SANCHEZ prior to the transaction with UC2.

23       39.     Later, in August 2017, agents provided ALVAREZ-SANCHEZ with an

24  undercover vehicle equipped with a hidden compartment and conducted a "flash roll"

25  operation, where UC2 showed ALVAREZ-SANCHEZ $70,000 in cash.  After seeing the

26  cash, ALVAREZ-SANCHEZ told UC2 that he would drive to California to pick up 20

27  pounds of methamphetamine, but (through electronic surveillance) agents determined that

28  he never did so.  A few days later ALVAREZ-SANCHEZ contacted UC2 and arranged to

1  deliver him 10 pounds of methamphetamine in the undercover vehicle.  Agents used a
2  "kill switch" to disable the vehicle as ALVAREZ-SANCHEZ drove it to meet UC2.
3  Local police towed the vehicle, released ALVAREZ-SANCHEZ, and seized the 10
4  pounds of methamphetamine from the hidden compartment.

5          40.     Following this operation, agents utilized CS1 to conduct two additional
6  controlled purchases of methamphetamine from Jamie ASTORGA-VEGA, who
7  dispatched a "runner," his girlfriend Yajaira ANDRADE-DIAZ, to deliver the drugs to
8  CS1.  Agents initiated a federal Title III wiretap of telephones used by Jaime
9  ASTORGA-VEGA and Prisciliano PASCACIO-PACHECO, who has been identified in
10 an independent DEA Tacoma investigation as a multi-pound methamphetamine
11 distributor who is an associate of Jose ALVAREZ-SANCHEZ and Javier GARCIA-
12 RODRIGUEZ.  Agents believe that PASCACIO-PACHECO is a management-level
13 member of the DTO.

14 **C.      Octaviano ASTORGA-VEGA's Use of the SUBJECT ACCOUNT**

15         41.     During the course of this investigation, CS1 reported that s/he frequently
16 communicates with Octaviano ASTORGA-VEGA regarding drug-trafficking matters
17 using Facebook Messenger.  CS1 identified the SUBJECT ACCOUNT as the account
18 that Octaviano ASTORGA-VEGA has used to communicate with CS1 about drug-
19 trafficking matters.  For example, according to CS1, in January 2017, CS1 communicated
20 over Facebook with Octaviano ASTORGA-VEGA, using the SUBJECT ACCOUNT, in
21 order to get a new local connection for drugs.  Octaviano ASTORGA-VEGA then gave
22 CS1 his brother's (Efrain ASTORGA-VEGA) number over Facebook messenger so that
23 his brother could provide CS1 with drugs.

24         42.     More recently, in December 2017, at the direction of agents, CS1 contacted
25 Octaviano ASTORGA-VEGA through Facebook Messenger.  Agents instructed CS1 to
26 attempt to contact Octaviano ASTORGA-VEGA (who was believed to be in Mexico) in
27 order to arrange to purchase drugs from his brother (Jaime ASTORGA-VEGA) in
28 Washington. CS1 attempted to do so, and later provided agents with screen shots of a

AFFIDAVIT OF JONATHAN L. PEARSON - 13

Facebook Messenger conversation with "Tavo Astorga,"[3] believed to be an account belonging to and used by Octaviano ASTORGA-VEGA. The following is a transcription of the Facebook Messenger conversation between CS1 and "Tavo Astorga" (the SUBJECT ACCOUNT), which occurred in Spanish:[4]

| | |
|---|---|
| CS1: | Well, Cholo, can you let your brother know to call me please because I need work |
| SUBJECT ACCOUNT: | You fucking asshole bitch watch your back go fuck yourself |
| CS1: | Now what dude what did I do |
| CS1: | Well, are you going to tell me why you are telling me this dude |

43.     Based upon my training, experience and knowledge of this investigation (including intercepted communication between the targets of the investigation), I believe that when CS1 sent a message to the SUBJECT ACCOUNT requesting that Octaviano ASTORGA-VEGA have his "brother" call CS1 because CS1 needed "work," that CS1 was requesting to be put in touch with Jamie ASTORGA-VEGA for the purpose of purchasing drugs. I know that it is common for Spanish-speaking drug traffickers to use the term "work" to refer to drugs. In speaking with CS1 regarding the above Facebook Messenger conversation, CS1 is unware why s/he received an unfavorable reply from

[3] I located the Facebook Account provided by CS1. The Facebook name is "Tavo Vega," the Facebook user number associated with that account is "100005498676248," and the Facebook username associated with that account is "tavo.vega.3950." Investigators compared profile pictures associated with that account to pictures of Octaviano ASTORGA-Vega and confirmed them to be of the same Octaviano ASTORGA-Vega indicted in case CR15-255RSL.

[4] This conversation was reviewed by linguists who have training and experience monitoring and documenting intercepted communication in Spanish. These linguists also have training and experience interpreting coded drug-related conversations and vague references to drug trafficking topics, both of which are tactics commonly used by drug trafficking suspects in an attempt to conceal their illegal activities. Unless otherwise noted, where communications in this Affidavit occurred in the Spanish language, I have simply used the translations from Spanish into English as provided to me by the linguists.

AFFIDAVIT OF JONATHAN L. PEARSON - 14

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1  Octaviano ASTORGA-VEGA, who ultimately did not put CS1 in contact with Jamie

2  ASTORGA-VEGA at that time.

3        44.    On January 16, 2018, at approximately 3:12 p.m., while in the presence of

4  investigators who monitored the call, CS1 received a telephone call from Jaime

5  ASTORGA-VEGA (TT1).  During the call, Jaime ASTORGA-VEGA told CS1 that he

6  wanted CS1 to get "work" (i.e., drugs) from him again.  CS1 questioned Jaime

7  ASTORGA-VEGA regarding the above Facebook Messenger communication with

8  Octaviano ASTORGA-VEGA and asked why Octaviano ASTORGA-VEGA may be

9  upset with CS1.  Jaime ASTORGA-VEGA told CS1 that he did not know why his

10  brother would be mad at CS1.

11        45.    Based on my training, experience and knowledge of this investigation, and

12  the information provided by CS1 regarding the SUBJECT ACCOUNT, I believe that

13  Octaviano ASTORGA-VEGA has used the SUBJECT ACCOUNT in the past to

14  communicate with drug trafficking associates in Washington to further his drug

15  trafficking activities, and that despite his recent reluctance to engage in a drug

16  conversation with CS1, that he still utilizes the SUBJET ACCOUNT to communicate

17  with his other drug trafficking associates to further his drug trafficking activities.

18  **V.    INFORMATION TO BE SEARCHED AND THINGS TO BE SEIZED**

19        46.    I anticipate executing this warrant under the Electronic Communications

20  Privacy Act, in particular Title 18, United States Code, Sections 2703(a), 2703(b)(1)(A)

21  and 2703(c)(1)(A), by using the warrant to require Facebook to disclose to the

22  government copies of the records and other information (including the content of

23  communications) particularly described in Section I of Attachment B.  Upon receipt of

24  the information described in Section I of Attachment B, government-authorized persons

25  will review that information to locate the items described in Section II of Attachment B.

26        47.    As indicated in the Motion for Nondisclosure and Motion to Seal that

27  accompany this Affidavit, the government requests, pursuant to the preclusion of notice

28  provisions of Title 18, United States Code, Section 2705(b), that Facebook be ordered not

AFFIDAVIT OF JONATHAN L. PEARSON - 15

1  to notify any person (including the subscriber or customer to which the materials relate)

2  of the existence of this warrant for such period as the Court deems appropriate.  The

3  government submits that such an order is justified because notification of the existence of

4  this Order would seriously jeopardize the ongoing investigation.  Such a disclosure would

5  give the subscriber an opportunity to destroy evidence, change patterns of behavior,

6  notify confederates, or flee from prosecution.  Notifying our targets of the existence of

7  this investigation will likely cause them to destroy evidence, flee the jurisdiction, or alter

8  their methods, thus making it more difficult to dismantle the organization effectively.

9  Notice also could put the CS, UC, and agents working with them in danger.

10       48.     It is further respectfully requested that this Court issue an order sealing all

11  papers submitted in support of this application, including the application and search

12  warrant, until such dates as provided in the proposed Order.  I believe that sealing this

13  document is necessary because the items and information to be seized are relevant to an

14  ongoing investigation.  Premature disclosure of the contents of this Affidavit and related

15  documents may have a significant and negative impact on the continuing investigation

16  and may severely jeopardize its effectiveness.

17       **VI.     COMMON CHARACTERISTICS OF DRUG TRAFFICKERS**

18       49.     Based on my training and experience, including experience obtained

19  through participation in this and other investigations involving the distribution of

20  controlled substances, including those targeting long-term conspiracies responsible for

21  the distribution of controlled substances, and based upon my consultation with other

22  experienced law enforcement agents and officers, I know that:

23       a.      Drug trafficking conspiracies, especially those involving large amounts of

24  narcotics and interstate shipments, usually take place over several months or years, and

25  continue to operate even when enforcement activity results in arrests and/or seizures of

26  drugs and/or money.

27       b.      Those involved in the distribution of illicit drugs often communicate by

28  telephone in connection with their illegal activities in order to set up meetings with

AFFIDAVIT OF JONATHAN L. PEARSON - 16

1  coconspirators, conduct drug transactions, or to arrange for the transportation drugs or

2  drug proceeds.

### VII.   CONCLUSION

4      50.    Based upon the information which has been uncovered during the course of

5  this investigation, and on the advice, experience, knowledge of other agents and officers

6  involved in this investigation, I believe these facts establish probable cause to conclude

7  that the SUBJECT ACCOUNT has been used, and will continue to be used, to facilitate

8  violations of the Controlled Substances Act, specifically distribution of narcotics,

9  conspiracy, and related offenses in the Western District of Washington, and elsewhere, in

10  violation of the Controlled Substances Act, Title 21, United States Code, Sections 841

11  and 846.  Furthermore, I also believe that there is probable cause to conclude that the

12  information requested pursuant to this search warrant will provide evidence of such drug

13  trafficking crimes committed by Octaviano ASTORGA-VEGA, his brothers and

14  associates, and will assist in locating and apprehending Octaviano ASTORGA-VEGA, a

15  known fugitive.

JONATHAN L. PEARSON,
TASK FORCE OFFICER
Drug Enforcement Administration

Subscribed and sworn to before me this **26** day of January, 2018.

J. RICHARD CREATURA
UNITED STATES MAGISTRATE JUDGE

AFFIDAVIT OF JONATHAN L. PEARSON - 17

## ATTACHMENT A

### Property to Be Searched

This warrant applies to all information associated with the identified subscriber or customer associated with the following Facebook account (the "SUBJECT ACCOUNT"):

a.     Facebook user number "100005498676248," Facebook user name "tavo.vega.3950," and Facebook name "Tavo Vega,"

that is stored at premises owned, maintained, controlled, or operated by Facebook, a company headquartered in Menlo Park, California.  This warrant is limited to information created after July 29, 2015.

## ATTACHMENT B

### Particular Things to be Seized

**I.     Information to be disclosed by Facebook**

To the extent that the information described in Attachment A is within the possession, custody, or control of Facebook, including any messages, records, files, logs, or information that have been deleted but are still available to Facebook, or have been preserved pursuant to a request made under Title 18, United States Code, Section 2703(f), Facebook is required to disclose the following information to the government for the SUBJECT ACCOUNT described in Attachment A:

A.  The following information about the customer or subscriber of the SUBJECT ACCOUNT:

    (a)  All contact and personal identifying information, including full name, user identification number, birth date, gender, contact e-mail addresses, Facebook passwords, Facebook security questions and answers, physical address (including city, state, and zip code), telephone numbers, screen names, websites, and other personal identifiers.

    (b)  All activity logs for the SUBJECT ACCOUNT and all other documents showing the user's posts and other Facebook activities;

    (c)  All photos and videos in their original format, including EXIF information (metadata), uploaded by that user ID and all photos and videos in their original format, including EXIF information (metadata), uploaded by any user that have that user tagged in them;

    (d)  All profile information; News Feed information; status updates; links to videos, photographs, articles, and other items; Notes; Wall postings; Friend lists, including the Friends' Facebook user identification numbers; groups and networks of which the user is a member, including the groups' Facebook group identification numbers; future and past event postings;

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1   rejected "Friend" requests; comments; gifts; pokes; tags; and information

2   about the user's access and use of Facebook applications;

3   (e)   All other records of communications and messages made or received by the

4   user, including all private messages, chat history, calling history, and

5   pending "Friend" requests;

6   (f)   All "check ins" and other location information;

7   (g)   All IP logs, including all records of the IP addresses that logged into the

8   SUBJECT ACCOUNT;

9   (h)   All records of the account's usage of the "Like" feature, including all

10   Facebook posts and all non-Facebook webpages and content that the user

11   has "liked";

12   (i)   All information about the Facebook pages that the account is or was a "fan"

13   of;

14   (j)   All past and present lists of friends created by the SUBJECT ACCOUNT;

15   (k)   All records of Facebook searches performed by the SUBJECT ACCOUNT;

16   (l)   All information about the user's access and use of Facebook Marketplace;

17   (m)   The types of service utilized by the user;

18   (n)   The length of service (including start date);

19   (o)   The means and source of payment for such service (including any credit

20   card or bank account number) and billing records;

21   (p)   All privacy settings and other account settings, including privacy settings

22   for individual Facebook posts and activities, and all records showing which

23   Facebook users have been blocked by the account;

24   (q)   All records pertaining to communications between Facebook and any

25   person regarding the user or the user's Facebook account, including

26   contacts with support services and records of actions taken;

27   (r)   Names (including subscriber names, Facebook user IDs, and screen

28   names);

UNITED STATES ATTORNEY
1201 PACIFIC AVENUE, SUITE 700
TACOMA, WASHINGTON 98402
(253) 428-3800

1       (s)     Addresses (including mailing addresses, residential addresses, business

2                 addresses, and e-mail addresses);

3       (t)     Local and long distance telephone connection records;

4       (u)    Linked accounts; and

5       (v)    Telephone or instrument numbers or identities (including MAC addresses).

6    B.  All records and other information (not including the contents of communications)

7       relating to the SUBJECT ACCOUNT, including:

8       (a)    Records of user activity for each connection activity for each connection

9                 made to or from the SUBJECT ACCOUNT, including log files; messaging

10               logs; the date, time, length, and method of connections; data transfer

11               volume; user names; and source and destination of Internet Protocol

12               addresses;

13       (b)    Information about each communication sent or received by the SUBJECT

14               ACCOUNT, including the date and time of the communication, the method

15               of the communication (such as source and destination email addresses, IP

16               addresses, and telephone numbers); and

17       (c)    Records of any Facebook accounts that are linked to the SUBJECT

18               ACCOUNT by machine cookies (meaning all Facebook user IDs that

19               logged into Facebook by the same machine or device as the SUBJECT

20               ACCOUNT).

21  **II.**     **Information to be seized by the government**

22       All information described above in Section I that relates to the ongoing narcotics

23  investigation described in the Affidavit, including, for the SUBJECT ACCOUNT

24  identified in Attachment A, information pertaining to the following matters:

25         (a) Any content including e-mails, messages, texts, photographs (including

26               metadata), videos (including metadata), visual images, documents,

27               spreadsheets, address lists, contact lists or communications of any type

28

AFFIDAVIT OF JONATHAN L. PEARSON - 21

1    which could be used to identify the user and or their location at any time

2    since July 29, 2015.

3    (b) All records relating to who created, used the user ID, and all records

4    identifying any person with whom the user has communicated with,

5    including records about their identities and whereabouts, since July 29,

6    2015.

7    (c) All subscriber records associated with the SUBJECT ACCOUNT,

8    including name, address, local and long distance telephone connection

9    records, or records of session times and durations, length of service

10   (including start date) and types of service utilized, telephone or instrument

11   number or other subscriber number or identity, including any temporarily

12   assigned network address, and means and source of payment for such

13   service including any credit card or bank account number.

14   (d) Any and all other log records, including IP address captures, associated

15   with the SUBJECT ACCOUNT; and

16   (e) Any records of communications between Facebook and any person about

17   issues relating to the account, such as technical problems, billing inquiries,

18   or complaints from other users about the SUBJECT ACCOUNT.  This is to

19   include records of contacts between the subscriber and the provider's

20   support services, as well as records of any actions taken by the provider or

21   subscriber as a result of the communications.

22

23

24

25

26

27

28

AFFIDAVIT OF JONATHAN L. PEARSON - 22